UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JEANNE PLUMMER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 1:11-cv-1698-WTL-DML |
| | ) |
| SOUTHERN HANCOCK COUNTY | ) |
| COMMUNITY SCHOOL CORP., et al., | ) |
| | ) |
| Defendants. | ) |

### ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

Each Defendant in this case has filed a motion for summary judgment.[1] The motions are fully briefed and the Court, being duly advised, **GRANTS** both motions for the reasons set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue

---

[1] To the extent the Plaintiff suggests that it was improper for the Defendants to file separate motions for summary judgment, she is incorrect. While a party who wishes to file more than one motion for summary judgment generally must seek leave of court to do so, there is nothing that requires all of the defendants in a case to file a single, joint motion for summary judgment.

may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II.  FACTUAL BACKGROUND

The facts of record relevant to the issues before the Court, viewed in the light most favorable to the Plaintiff, who is the non-moving party, are as follow.

Plaintiff Jeanne Plummer began working as a substitute bus driver for Defendant Community School Corporation of Southern Hancock County ("the District") in November 1992 and became a full-time bus route driver in August 1994. During Plummer's tenure at the District, bus drivers worked pursuant to an annual contract that ran for a period of one school year. Plummer consistently received favorable performance evaluations and her contract was renewed each year through the 2010-11 school year.

Defendant James Halik has been the Superintendent of the District since July 2004.

In 2010, the District, like many public school districts in Indiana, anticipated receiving decreased funding for the 2011-12 school year because of a recently enacted property tax cap. In an attempt to counteract these anticipated cuts, the District placed a school tax referendum on the ballot in the fall of 2010. In October 2010, Plummer's husband, who had served on the District's school board from 1994 until 2006, was quoted in the local newspaper as being against the referendum.

The referendum ultimately did not pass. The District's administration then began discussing ways to reduce costs throughout the District. One cost-saving measure that was

adopted was the elimination of the assistant principal position at Doe Creek Middle School beginning in the 2011-12 school year. The assistant principal whose position was being eliminated was Stephen Satterly, who also served as athletic director for the middle school. In January 2011, Halik met with Satterly and told him that his plan was to move Satterly into the position of Director of Transportation for the District and have him also continue to serve as athletic director of Doe Creek Middle School. This would result in the employment of the current Director of Transportation, James Scroggin, Jr., being terminated.

In February and March 2011, four letters to the editor written by Plummer were published in local newspapers. Plummer asserts, and for purposes of the instant motions the Defendants do not dispute, that these letters addressed matters of public concern and were protected by the First Amendment.

Sometime in March or April 2011, School Board member Meghan Morrison contacted Halik and asked to meet with him to "clear the air," as she felt there had been tension between her and other board members since she joined the board in January 2011. Halik agreed, and the two met in his office for several hours, discussing a wide range of things, including Plummer and the plan to move Satterly into the Director of Transportation position. The specifics of this conversation, which was recorded by Morrison without Halik's knowledge, are discussed in more detail in the discussion section below.

On April 11, 2011, Halik called Satterly and told him that he would be assuming the role of Interim Director of Transportation the following day. Satterly officially became the Director of Transportation on July 1, 2011.

At the end of April 2011, Halik and Assistant Superintendent Bob Yoder, to whom the Director of Transportation directly reported, met with Satterly to discuss reorganizing the

3

Transportation Department. They discussed ideas on how to reduce costs, which included possibly making the bus routes more efficient to allow a reduction in the number of drivers. At no time during this meeting was Plummer referenced or identified. There also was no discussion of which bus drivers should be hired for the next school year. In fact, the entire meeting lasted just ten minutes, and Satterly was frustrated that he did not receive more guidance from Halik and Yoder about how to run the Department. Following this meeting, Satterly set about reviewing the bus routes to determine if there was a more efficient way to organize them.

Halik had told Satterly that there were long-standing morale issues in the bus garage that needed to be addressed. Satterly's observations after becoming Director of Transportation confirmed that there was tension among the drivers and that three drivers—Plummer, Michelle Bruns, and Terri Wheeler—seemed to be the "focal point" of the tension.

With the goal of creating a more positive work environment in the transportation department, Satterly decided to interview all of the bus drivers "to gain as much knowledge as I could about the person to determine whether they would fit in with that goal." Satterly Dep. at 44. As a secondary goal, Satterly hoped to save money through reorganizing the department. When asked at his deposition to quantify the relative importance of his two goals, Satterly said 70% of his focus was on creating a positive work environment and 30% was on cost reduction.[2]

Satterly developed a list of fourteen questions to use during the driver interviews. Satterly personally created the list of questions; Halik did not help him draft the questions in any way, nor did anyone else. Satterly asked each driver the same fourteen questions. Satterly also

---

[2] The parties dispute whether the reorganization ultimately resulted in cost reduction. It is not necessary for the Court to determine whether there is a genuine issue of fact with regard to that question, inasmuch as it is not material to the Court's decision.

reviewed the drivers' personnel files prior to the interviews. Satterly recorded the driver interviews without the knowledge or consent of the drivers.

Plummer was interviewed by Satterly on June 3, 2011. Prior to entering his office to begin the interview, Satterly told Plummer that he would be making recommendations to Yoder and Halik and they would be making the final decisions. When Plummer first came into Satterly's office to begin the interview, she had her phone in her hand and a Bluetooth piece in her ear. Satterly's laptop began to make "electronic chatter" that he believed indicated there was another open electronic source nearby. This did not happen during any of the other employees' interviews. It also appeared to Satterly that Plummer had a device under her phone. Based on these observations, Satterly believed that Plummer was recording the interview. Satterly thought this showed that Plummer had trust issues, as Plummer appeared to Satterly to be "furtive." Plummer did not, in fact, record the interview.

During the interview, Plummer discussed her interactions with the other drivers. She told Satterly that there was a group at the bus garage who did not want to hear her ideas. She also stated that she did not "say things" to offend people, although sometimes she did offend them. Plummer further claimed that she could not go to other drivers with ideas because if she did they would "turn their backs"; Plummer therefore had to "go through a back door" to get her ideas heard and had to let her ideas "be someone else's idea." Plummer became emotional during the interview. At the end of the interview, Plummer told Satterly that she was the "biggest target" in the bus garage because she was not afraid to give her opinion and ask questions. Plummer did not think that people liked the fact that she asked questions and gave her opinions, but concluded that she could not change her behavior because that was her "for better or worse." Recording of Plummer Interview. Satterly thought that some of Plummer's answers "came off as arrogant"

5

and that "she was kind of putting herself up as better than the other drivers," although during his deposition he could not specifically recall what particular statements she made that led him to that conclusion. Satterly Dep. at 75-76.

One of the questions Satterly asked the drivers was "Who would you consider the most negative person in the garage?" Of the forty-six bus drivers and aides interviewed, twenty-one of them identified Plummer as the most negative or one of the most negative people in the garage. Michelle Bruns and Theresa Wheeler were identified by the second and third highest number of people respectively. Eleven other drivers were identified as being the "most negative," but none of them as many times as Plummer, Bruns, and Wheeler.[3]

After completing the interview process, Slattery decided not to recommend renewing Plummer's contract for the 2011-12 school year. His decision was based on "trust issues and the lack of positive interactions with others." Satterly Dep. at 95. By "trust issues," Satterly was referring to his belief that Plummer surreptitiously recorded her interview with him.[4] His conclusion regarding her lack of positive interactions was based on the responses she gave during her interview. He also decided not to recommend renewing Bruns' and Wheeler's contracts.

After making his hiring decisions, Satterly created a list of bus drivers whom he was recommending for employment for the 2011-12 school year and a list of bus drivers whom he was not recommending for employment. He met with Halik and Yoder in person to show them the lists. Halik and Yoder both looked at the lists; Yoder asked Satterly if he was "sure," and Satterly replied that he was. Neither Halik nor Yoder suggested that Satterly rethink or change

---

[3] Wheeler was identified nine times and Bruns seven times. Another driver was identified three times, two other drivers were identified twice, and eight drivers were each identified once.

[4] Plummer correctly points out the irony of the fact that Satterly was himself surreptitiously recording the interviews.

any of his hiring decisions, nor did they make any comments about the individuals Satterly selected to be employed and not to be employed.  Satterly never told Halik why he decided not to rehire Plummer, and Halik never asked him for the basis of his decision to not offer Plummer a contract.  In fact, Halik merely looked at the lists without making any comment at all.

Satterly drafted letters to those whom he was recommending for termination to inform them of that fact.  On Halik's instructions, Satterly emailed the letters to Halik's administrative assistant so that she could "correct any verbiage and send them on to the Board."  Satterly Dep. at 88.  On July 11, 2012, Satterly sent a letter to Plummer informing her of his decision not to recommend her for employment for the 2011-12 school year. On July 18, 2011, the School Board held a regularly scheduled board meeting. At this meeting, the Board was asked to approve a Personnel Report that included a list of personnel recommendations to the Board. The Personnel Report included a list of thirty individuals that Satterly recommended as bus drivers effective August 3, 2011.  The School Board approved the Personnel Report, including Satterly's recommendation.  Because Plummer's name was not on that list, her contract was not renewed for the 2011-12 school year.  Plummer was never given a performance evaluation by Satterly or disciplined by him prior to the non-renewal of her contract, and she was never provided with any explanation for the termination of her employment with the District.

## III. **DISCUSSION**

Plummer alleges that her contract was not renewed and thus her employment with the District was terminated because of her relationship with her husband, who opposed the referendum, and her letters to the editor and that this was unlawful retaliation in violation of her First Amendment rights.  She has sued the District and also has sued Halik in both his individual and official capacities.  Two motions for summary judgment pend; one addresses the claim

against Halik in his individual capacity and the other addresses the remaining claims.[5] Each motion is addressed, in turn, below.

### A. Halik's Motion

Halik argues that he is entitled to summary judgment for a fundamental reason: he did not participate in, and therefore was not responsible for, the decision not to renew Plummer's contract. Because "§ 1983 liability is premised on the wrongdoer's personal responsibility . . . [a]n individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012) (citations and internal quotation marks omitted). Plummer concedes, as she must, that Halik can be liable to her only if he was personally involved in the decision to terminate her employment, but argues that the record contains evidence from which a reasonable jury could find that he was.

The testimony of Halik and Satterly is unequivocal: Satterly made the decision not to recommend that Plummer's contract be renewed, and he made that decision without any input from Halik. In order to survive summary judgment, then, Plummer must point to evidence from which a reasonable jury could find that this testimony is not true and that Halik did, in fact, proximately cause the termination of her employment.

Plummer paints a damning picture with regard to Halik's involvement in her termination:

> Halik made numerous statements to Morrison demonstrating his retaliatory motives and plans to orchestrate the termination of Plummer under the guise of a reorganization of the Department of Transportation. Halik stressed that he had everything planned out, and he knew certain people would not be retained after the reorganization. Halik's plan appears to have been successfully orchestrated, with the noted exception of the audio recording revealing the truth behind his process. Scroggin, the person in the best position to evaluate whether Plummer was meeting expectations, refused to recommend the termination of Plummer. On multiple occasions, Halik pressured Scroggin to provide a list of people to

---

[5]As the parties recognize, Plummer's suit against Halik in his official capacity is a suit against the District.

8

> terminate, while at the same time mentioning Plummer's letters to the editor and discussing the need for employees to be positive in their characterization of the School. When Scroggin refused to recommend the termination of Plummer, Halik hatched his plan to replace Scroggin with Satterly, who he knew would terminate Plummer, along with Marge Jones because she was too old to drive a bus, according to Halik. Satterly even told Plummer, during her interview, that he only made recommendations to Halik and Yoder. It is clear that Halik attempted to place a buffer between himself and Plummer's termination, which if it were not for the audio recording and testimony of Scroggin, may have convinced this Court and a jury that he was not involved in Plummer's termination. Based on the evidence showing Halik's state of mind and intent to terminate Plummer in a very specific way, which was fulfilled, this is an issue of fact for the jury which cannot be decided by the Court on summary judgment.

Plummer Brief at 29. Thus, Plummer points to two sources of evidence that she believes create an issue of fact regarding Halik's involvement in the decision to terminate her employment: the testimony of Scroggin and Halik's conversation with Morrison. The problem is that the evidence of record simply does not match Plummer's characterization of it.

The lynchpin of Plummer's theory of the case is that Halik tried to get Scroggin to terminate Plummer and then terminated Scroggin and replaced him with Satterly because Scroggin refused to do so.[6] While Scroggin signed a declaration which at least arguably can be characterized as supporting Plummer's assertion that "[o]n multiple occasions, Halik pressured Scroggin to provide a list of people to terminate, while at the same time mentioning Plummer's letters to the editor and discussing the need for employees to be positive in their characterization of the School," Scroggin's deposition testimony makes it clear that such a characterization is not an accurate representation of what actually occurred:[7]

---

[6]Plummer asserts that Halik "knew" Satterly would terminate her, although she cites no evidence for this alleged knowledge.

[7]To the extent that Scroggin's deposition testimony conflicts with his declaration, the deposition testimony controls. *See Beckel v. Wal-Mart Assocs., Inc.* 301 F.3d 621, 623 (7th Cir. 2002) ("Affidavits, though signed under oath by the affiant, are typically and here written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in

9

Q: Do you believe that the [District] retaliated against Mrs. Plummer for writing letters to the editor of the local newspaper?

A: I think it's possible.

Q: Why do you think that?

A: It's based on discussions I had with Mr. Halik prior to my leaving.

Q: Tell me about those discussions.

A: Mr. Halik was pretty clear not to make a clear directive, but was constantly talking about persons who weren't completely loyal to [the District], or who he felt were detrimental to the morale of the group should be recommended to be removed.

\*\*\*

A: Mr. Halik was very careful never to mention a name, and always to state that those recommendations would be mine solely, and that he would act on whoever—whomever I recommended. But it was more than obvious to me that there were several individuals that he wanted recommended.

\*\*\*

Q: What concern [about Plummer] did Mr. Halik express to you at that point?

A: He was always very vague. He constantly—I actually, probably, brought that up more so than he. And I would never get a direct answer as though he were trying to keep himself from the spotlight.

Q: And I'm a little confused. You said, "I brought that up more than he." What are you referring to there?

A: Well, I knew that he had an issue with her. And I was trying to get him to tell me if he indeed, wanted her – wanted a recommendation from me to terminate her.

Q: How did you know he had an issue with her?

A: Well, it was pretty obvious by the editorials, and those kinds of things, that [Plummer] had published in various news sources. And statements that were made by her husband in board meetings that there was—there was an

---

credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy.").

10

        issue. I assumed from the conversation with Mr. Halik and Mr. Yoder on recommendations for termination of several drivers that she was included in the group. And I did bring up a few times, I think it's appropriate, you know, did ask, point blank, "Do you want me to recommend her for termination?" And he would always say, "you know, that's your decision. If you feel an individual is detrimental to the group, not a team player, then I would expect you to make that recommendation." He would never come straight out and say, "I want you to recommend Jeanne Plummer to be terminated." He never would do that. But it was obvious to me from the conversations that I was probably going to be not in good standing with he [sic] as a superintendent if I didn't make that recommendation.

Q:     And what led you to that conclusion?

A:     It was obvious from his body language and the gestures and the things that he said. Although, I would be careful to point out that he never directly said to do that. And I think, probably, that led to my dismissal as transportation director.

***

Q:     What I'm asking you to tell me is what did they tell you in terms of these recommendations?

A:     There was just general discussion on—I asked point blank about—specifically, about individuals. They would never, I say "they," Mr. Halik would never directly mention an individual and mention that he expected them to be recommended for dismissal, but it was obvious that there were recommendations that they wanted made. Like I said, he was very careful to always say, you know, it was my decision.

Q:     How would it come to pass that they wanted you to make recommendations? I don't understand that.

A:     Okay. We met in their office, and there was discussion, ongoing discussion, especially after the referendum, about how changes were going to be made, cuts were going to need to be made based on financial concerns. And there were several discussions about, you know, who they felt—how they felt individuals should be team players and that.

Q:     So what would you point to among the issues we've discussed as evidence that the school possibly retaliated against [Plummer]?

A:     Basically the fact that it was obvious they weren't happy with statements made by her husband or via the letters. I was asked to make recommendations for people who, maybe, weren't team players. And I,

11

        specifically, mentioned individuals, and there was no directive given to not make recommendations on those individuals, which led me to believe that those individuals should be included in a recommendation, if I made a recommendation, which I chose not to make.

Q: So the fact that there was no response led you to believe that you should let those folks go?

A: It was more than that. There was not just no response, but there was discussion about those individuals, and if I felt they weren't team players, that I would be expected to make recommendations. However, Mr. Halik was always careful to close with "That would be your recommendation, not mine."

Q: But, again, just to clarify, because I think maybe you're saying something different; I'm not sure. I think you testified earlier that there was never any specific discussion about Mrs. Plummer; is that correct.

A: None that I didn't bring up.

Q: Okay. You testified just a moment ago, when you were answering my question, that you believed that they . . . were unhappy with the fact that Mrs. Plummer had written letters to the editor. What led you to that conclusion?

A: There was a lot of talk around the office about it. There was talk about it throughout the school system, not just specifically with the administration. But the letters were clearly against the referendum. Against the administration's decision to being a referendum, so . . .

***

Q: Did you hear any comments from Mr. Halik about letters to the editor?

A: I, specifically, brought that up when referencing Mrs. Plummer, when we talked about, you know, individuals needing to be—recommendations needing to be made for individuals who he deemed that, maybe, weren't team players. And we did discuss, although it be [sic] not in-depth, but we did discuss that as an issue.

Q: You said it's a topic you raised?

A: I raised it, yes. And I did mention Mrs. Plummer, specifically, myself, because I couldn't get a clear and definitive answer from Mr. Halik. I was trying to get an understanding of what, exactly, it was that they expected

12

>                from me as a recommendation. But as I said before, I never got a
>                definitive yes, but I also never got a definitive no.
>
>                                              ***
>
>    Q:         Did Mr. Halik ever express to you that he thought Mrs. Plummer caused
>                morale problems in the transportation department?
>
>    A:         No, he never said that directly. But he did indicate that anyone who did
>                cause morale problems should be recommended for discipline,
>                disciplinary action.

Scroggin Dep. at 14, 19-20, 27-28, 31-32, 36-40. When asked specifically about the paragraph in his declaration that states that Halik referenced Plummer's letters to the editor "when discussing the need for employees to be positive in their speech and characterization of the [District]" and the apparent conflict between that statement and his deposition testimony, Scroggin answered emphatically that the declaration was referring to a conversation in which *Scroggin* brought up Plummer and the letters and that Halik never raised either Plummer or the letters himself. *Id.* at 51-52. Scroggin was then asked how Halik responded when the letters were raised by Scroggin, to which he replied, "He really wouldn't speak directly to it. He would say things like, 'You know, if you feel that any employee is causing morale issues within the fleet, or that they weren't loyal to the corporation, that, you know, you should make a recommendation on their employment.'" *Id.* at 56-57.

   Scroggin's deposition testimony is noteworthy in its internal consistency and in its consistency with Slattery's testimony. Both men agree that Halik steadfastly refused to tell them whom they should recommend for termination. Scroggin's attempts to draw Halik into a conversation about Plummer and whether she should be terminated were unsuccessful. Therefore Halik, Scroggin, and Satterly all agree that Halik was unwilling to direct either Scroggin or Satterly to terminate Plummer and, in fact, took pains not to influence the decision.

To the extent that Scroggin was aware that there was an "issue" between Plummer and Halik, that awareness came not from statements made by Halik, but rather "talk" around the District and Scroggin's own inference based on the content of the letters and statements made at board meetings by Plummer's husband. Scroggin's testimony, then, does not support Plummer's assertion that Halik "pressured Scroggin to provide a list of people to terminate, *while at the same time mentioning Plummer's letters to the editor*." Plummer Brief at 29 (emphasis added).

Plummer also asserts that the transcript of the conversation between Morrison and Halik "shows a clear intent on Halik's part to terminate Plummer" and reveals Halik's "scheme to terminate Plummer." Plummer Brief at 5. In fact, the relevant part of the transcript (omitting Morrison's responses) reads as follows:

> My job is to recommend personnel and get people in the right spot. There is a book that Jim Collins wrote called Good to Great, and in his book Good to Great he always talks and teaches us . . . it is not whether you have to get the right people on the bus, but you get them in the wrong seat. So you don't have people in the right seat, move them around to different seats first before you get rid of them and then fire them if they are not . . . They are on the bus, if they are in the wrong seat, get them in the right seat or get them off the bus. . . .
>
> All right, [Plummer] is on the bus, I don't know if we have a seat for her. She writes an editorial here now that says that, I'll probably lose my job and be a sacrificial lamb or something like that. . . . I can't run this district for fear of firing her or not firing her because she wrote a letter to the editor.[8] She has been a pain in the butt ever since I have been here. Why do we keep people like that? She doesn't meet our expectation. She causes dissention in the ranks constantly. . . . She wrote that to protect herself from being dismissed. Let me share with you, if I wanted to fire her for writing letters to the editor, I could do that. But I need to buy her contract down. You know what, her contract does expire. All contracts eventually have an expiration date. Her contract is going to expire. I need the board to just say reorganize, everybody's contract expires out there May 28th, reorganize the whole department. . . . .
>
> What I want to do is Mr. Scroggins isn't getting the job done. And I want to dismiss him. His contract expires and I don't want him back. I want Mr. Satterly

---

[8]This is a reference to statements in some of Plummer's letters predicting that she would be fired for speaking out but that the District would be careful to make it look "legitimate."

14

> to be the corporation . . . . He is military. He is not necessarily the strongest military man, but you know what he has a degree in administration which forces you to read the right books, know the right processes for getting thing done. To [Scroggins]—a compliment to [Scroggins] is he does the best he can with the skills he has, he never had any leadership, you know, he has been the director of transportation for over 14 years, but what I like is that there is some skills that could have been learned or picked up through some additional training that we haven't been above to provide him, he didn't find or seek on his own.
>
> I need a leader down there right now. If we are going to get out of that financial mess, it is not a mess, but the woes. I need someone who can march in there and change the way we do business. With Jim Satterly we can do that . . . .
>
> So back to [Plummer], I want somebody to direct me in that board room and say: Jim, if this is what you want to do and you think it is right, to put Mr. Satterly in charge of transportation, then we want him to be able to choose who works for him. Bingo, all contracts are expired. And he can sit here with you and go through all the files of the personnel and interview everybody down there and bring back the ones he wants. You know what, there will be two or three that won't get a job. Take for example, Marge was not going to be re-employed because . . . I am getting more and more complaints because she is 80-some years old, she is not monitoring and supervising and she is making mistakes driving, and we have them on camera. Do you want your daughter riding on a bus with an 80-some year old? You cannot age discriminate, but if we fire her, we are age discriminating. If her contract expires and we chose not to hire her back, there is no discrimination, she had an equal opportunity as everybody else to be hired back. . . .
>
> You know what, we don't need Marge back. We need him to decide on—I'm not going to tell him not to hire Marge, but I know if I was him and he is going to interview, why would you hire an 80-year-old person to drive a bus . . . .
>
> I want [Satterly] though to make the decision of whether he wants [Plummer] back or not, if he wants her back, that's his choice. If he wants Marge back, that's his choice. If he wants Maryann Swartz, that's his choice. It is who he wants based on interviews and his opinion.

Plummer urges the Court to infer from this transcript that Halik told Satterly not to renew Plummer's contract and thus Halik caused Plummer's termination. It would be reasonable to infer from this transcript that Halik believed Plummer should lose her job because, in his view, she was a "pain in the butt" and "cause[d] dissention in the ranks constantly." It would also be reasonable to infer that Halik hoped that Satterly would make what Halik viewed to be the right

15

decision with regard to Plummer, and that Halik had faith in Satterly's ability to make what Halik viewed as good decisions. But the Court does not believe a reasonable jury could take the next, crucial step and infer that Halik instructed or encouraged Satterly to do so, or even hinted that he should.

In fact, all of the evidence pointed to by Plummer is consistent on this point and makes the inference she urges unreasonable. In the transcript, Halik says explicitly that he expects Satterly to make the decision regarding which drivers to employ. This is consistent with his observations about Satterly's leadership skills and educational background. Halik does not say that he wants someone he can push around; rather, he wants someone who will make sound decisions and provide leadership. And, as discussed above, the testimony of Satterly, Halik, and even Scroggin is entirely consistent with what Halik told Morrison. There is simply no evidence from which a reasonable jury could conclude that Halik participated in the decision not to renew Plummer's contract, or that he was the proximate cause of that decision being made. Accordingly, Halik is entitled to summary judgment.

### B. The District's Motion

The only person within the District that Plummer alleges retaliated against her for exercising her First Amendment rights is Halik. Therefore, Plummer's claim against the District depends upon Halik being the proximate cause of the termination of Plummer's employment, either because he made the final decision himself or because the District can be liable for making a decision that was influenced by Halik's retaliatory motive.[9] Because, as explained above, Plummer has not identified evidence from which a reasonable jury could find that Halik was the

---

[9]The Court need not, and therefore does not, address Plummer's alternative theories that Halik was a policymaker or that the District could nevertheless be liable for Halik's decision under a "cat's paw" theory, because both theories depend on a finding that Halik was the proximate cause of the termination of Plummer's employment.

proximate cause of Plummer's termination, her claim against the District fails and the District is entitled to summary judgment.

## IV.  CONCLUSION

For the reasons set forth above, both motions for summary judgment are **GRANTED** in their entirety.

SO ORDERED:  04/30/2013

*[signature: William T. Lawrence]*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification